# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-319 (RCL)** |
| **v.** | : | |
| | : | |
| **COLTON WARGO,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Colton Wargo to a sentence of 14 days' incarceration as part of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Colton Wargo ("C Wargo"), a 27-year-old laborer and honorably discharged U.S. Marine Corps veteran from Westlake, Ohio, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

C Wargo pleaded guilty to one count of violating 18 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 14 days' incarceration is appropriate in this case because C Wargo, along

---

[1] The approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

with his mother, Kimberly Wargo ("K Wargo"): (1) after attending the "Stop the Steal" rally at the Ellipse and marching to the grounds of the U.S. Capitol, arrived at the West Front of the U.S. Capitol Building where violent activity was underway; (2) entered into the U.S. Capitol Building through the broken Senate Wing Doors at 2:20 p.m., approximately seven minutes after the doors were breached by other rioters; (3) traveled from the Rotunda and walked extensively to other parts of the Capitol, including near private House and Senate offices; and (4) after being in the Capitol Building for more than 30 minutes, only left the building after encountering police officers in riot gear with guns drawn who ordered them to leave.

Even though C Wargo and K Wargo (collectively, "the Wargos") did not engage in violence or property destruction during the riot, the Court must also consider that C Wargo's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of C Wargo's crime supports a sentence of 14 days' incarceration as part of a 36-month term of probation in this case.

## II.       Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, at 1-7.

### *C Wargo's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, the Wargos left Ohio and traveled to Washington, D.C. to attend the "Stop the Steal" rally scheduled to take place on January 6, 2021 at the Ellipse near the White House. On the morning of January 6, 2021, the Wargos attended former President Trump's "Stop

2

the Steal" rally held at the Ellipse, then marched with other rioters to the grounds of the U.S. Capitol Building.

According to C Wargo, he and his mother were on the grounds of the U.S. Capitol when Alex Jones gave a speech on the West Front of the Capitol, which was at approximately 1:51 p.m. At approximately 2:03 p.m., law enforcement officers began to engage with members of a mob, some of whom were assaulting officers and others who were ignoring the commands of the officers. The United States Capitol Police had also set up amplification equipment that repeatedly broadcast an order for the crowd to disperse.

Image 1 depicts what the West Plaza of the Capitol Building looked like at approximately 2:00 p.m. At the time, armor-clad police officers were engaged with members of a mob, some of whom were assaulting officers. The police were repeatedly broadcasting an order commanding the crowd to disperse.

Image 1



At approximately 2:13 p.m., a rioter breached the police line and broke a window in the area of the Senate Wing foyer, climbed through that window, and opened an adjacent door so that other rioters could gain access to the Capitol Building. Other rioters shattered the adjacent window. Both activities left broken glass on the floor of the Senate Foyer. *See* Image 2.

Image 2



Seven minutes later, at approximately, 2:20 p.m., Speaker of the House Nancy Pelosi was removed from the House Chamber by her protective detail and the House of Representatives was gaveled into recess and members started to evacuate. At the same time, the Wargos (encircled in red) entered into the U.S. Capitol through the broken Senate Wing Doors. *See* Image 3.

Image 3



The Wargos traveled from the Senate Wing foyer to the Rotunda, where they remained for approximately three minutes. *See* Image 4.

Image 4



As members of Congress and their staff hid behind closed and sometimes barricaded doors, the Wargos left the Rotunda and appeared to walk aimlessly, parading in and out of several hallways of the Capitol near Senate and House offices on multiple floors and into Statuary Hall from approximately 2:28 to 2:52 p.m. See Images 5-9; Images 5 and 6 show the Wargos walking through private office corridors and Image 7 shows the Wargos in Statuary Hall.

Image 5



Images 6-8







Image 9



After parading inside the Capitol for more than 30 minutes and traveling from the Senate Wing doors to the southeast side of the Capitol, the Wargos were forced to leave the building by riot gear wearing police officers at 2:52 p.m.

*Colton Wargo's Voluntary Statement to the FBI*

On May 20, 2021, C Wargo volunteered to be interviewed by the FBI. He initially denied that he was inside the U.S. Capitol Building on January 6, 2021. When he was informed that he was being interviewed as part of federal investigation, he admitted that he traveled with his mother, K Wargo, to Washington, D.C. on January 5, 2021, attended the rally for President Trump, and, after the rally, walked with a crowd to the U.S. Capitol. He stated that he and his mother arrived on the side of the Capitol that faced the Washington Monument. At the time of their arrival, the crowd was chanting and cheering near the scaffolding on the Capitol Building. Also, Alex Jones was giving a speech.

When the Wargos approached the Capitol Building, C Wargo stated that he noticed people were walking into the building and he and his mother followed the people into the building. He admitted that he walked past offices in the Capitol. After walking up a flight of stairs to the second

floor of the Capitol, an armed tactical police team yelled at him and his mother to leave the building.

C Wargo stated that he stopped a man who was trying to kick in a door and picked up papers that he found lying on the ground. He did not take any photos or videos while inside the Capitol. He added that he does not have any social media accounts.

C Wargo was again interviewed by FBI agents on August 8, 2021, when C Wargo was shown a photograph captured by a U.S. Capitol Building surveillance camera inside the building and he identified himself and his mother in the photograph.

*The Charges and Plea Agreement*

On May 3, 2022,  the United States charged the Wargos by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF 1. On May 4, 2022, the Wargos voluntarily surrendered to the FBI office in the Northern District of Ohio. ECF 5, 6. On September 23, 2022, the Wargos were charged in a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF 20.

On February 7, 2023, pursuant to a plea agreement, C Wargo pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, C Wargo agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

C Wargo now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. C Wargo must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of the recommended sentence of 14 days' incarceration and three years' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing C Wargo's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like C Wargo, the absence of violent or destructive acts is not a mitigating factor. Had C Wargo engaged in such conduct, he would have faced additional criminal charges.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would – at a minimum – have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

A particularly aggravating feature of C Wargo's offense is that he ignored the upheaval on the West Front of the Capitol, as well as the broken windows and shattered glass that lay on the

floor when he gained entry to the U.S. Capitol within minutes of the breach, particularly given his military training. Additionally, despite the ongoing riot, the Wargos aimlessly paraded throughout the Capitol for more than 30 minutes until such time that they were confronted by riot clad police officers who yelled at them and told them to leave the Capitol Building. Furthermore, C Wargo initially denied that he was at the U.S. Capitol on January 6, 2021, and has shown no remorse for his conduct.

Accordingly, the nature and circumstances of this offense establish the clear need for the recommended sentence of 14 days' incarceration and three years' probation.

### B.   Colton Wargo's History and Characteristics

As set forth in the Presentence Investigation Report ("PSR"), C Wargo is a 27-year-old laborer and honorably discharged U.S. Marine Corps veteran from Westlake, Ohio. PSR ¶¶ 30, 47, 48. He was a member of the military from 2014 to 2018 and achieved the rank of Corporal. When he was interviewed by FBI agents on May 20, 2021, C Wargo added that was in the ghost reserve (Individual Ready Reserve).

C Wargo stated that he does not have any social media accounts. PSR ¶ 49. He also does not have any criminal history. PSR ¶¶ 23-28.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As the images above show, the Wargos gained access to the U.S. Capitol after rioters broke the police line on the West Front of the Capitol and entered the broken glass filled Senate Wing foyer through a door that was broken by other rioters. At no time did the Wargos adhere to any security protocols. Rather than follow the mob that also gained access to the Capitol at the same time that they did, the Wargos charted their own course down numerous hallways inside the Capitol, particularly near Senate and House staff members' offices. Also, the Wargos had to be told to leave the Capitol. Thus, a sentence of 14 days' incarceration as part of a 36-month term of probation is warranted to deter similar conduct in the future.

11

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence C Wargo based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

C Wargo has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

13

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure

14

substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

In *United States v. Janet West Buhler,* 21-cr-510 (CKK), the defendant entered and remained in a sensitive area of the Capitol and cheered as rioters physically assaulted U.S. Capitol Police officers at the East Rotunda doors. Similar to C Wargo, Buhler ignored several red flags upon approaching and entering the Capitol Building, including the sounds of flashbangs being detonated, plumes of smoke clouding the air, rioters tearing down tarp covering the northwest staircase of the Capitol Building, and shattered glass that was the result of rioters breaching the Senate Wing Doors. C Wargo walked around private office space, whereas Buhler entered the Senate Gallery, a highly sensitive space, which merited a slightly higher sentence in that case. The Court sentenced Buhler to 30 days' incarceration followed by 36 months' probation.

In *United States v. Jon Mott,* 21-cr-464 (RCL), the defendant entered the Capitol Building with a large group of rioters who pushed past vastly outnumbered police officers at approximately 2:56 p.m. Once inside the building, like the Wargos, Mott traveled to the Rotunda. Mott remained inside the Capitol for approximately 17 minutes. Whereas Mott got into both physical and verbal confrontations with police officers, the Wargos did not, but both Mott and the Wargos had to be forced to leave the Capitol by police officers. This Court sentenced Mott to 30 days' incarceration followed by 36 months' probation.

In *United States v. Brandon and Stephanie Miller,* 21-cr-266 (TSC), the defendants entered the U.S. Capitol through a broken window by the Senate Wing doorway approximately 45 minutes

after the initial breach and more than 30 minutes after the Wargos. The Millers made videos and posted them on Facebook, expressing pride about taking part in the breach, which the Wargos did not. However, the Millers were only in the Capitol Building for 10 minutes, while the Wargos walked around for 30 minutes. Like C Wargo, the Millers did not express remorse or fully take responsibility for their actions. The Court sentenced Brandon and Stephanie Miller to 14 days' incarceration followed by 36 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Colton Wargo to 14 days' incarceration as part of a 36-month term of probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing

16

his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ Anita Eve
        Assistant United States Attorney
        PA Bar No. 45519

## <u>CERTIFICATE OF SERVICE</u>

On this 8th day of June 2023,  a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ Anita Eve
Assistant United States Attorney
PA Bar. No. 45519